Filed 2/21/23 P. v. Johnsen CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>APOLLO JOHNSEN,<br><br>    Defendant and Appellant. | H048634<br>(Santa Clara County<br>Super. Ct. No. C1641253) |

Defendant Apollo Johnsen[1] was convicted by a jury of 16 counts stemming from his prolonged sexual abuse of a child over a period of 10 years. Jane Doe, the victim in all counts, was defendant's sister-in-law, the half-sister of his wife. The trial court sentenced defendant to a total indeterminate prison term of 240 years to life and a determinate term of 44 years eight months.

On appeal, defendant argues the trial court prejudicially abused its discretion and violated his federal constitutional rights by making various evidentiary errors: (1) admitting a pretext phone call as evidence of an adoptive admission by defendant; (2) admitting evidence of previous uncharged sex crimes; (3) admitting evidence of child sexual abuse accommodation syndrome; (4) limiting the scope of cross-examination of the People's clinical psychologist expert; and (5) admitting evidence of prior robbery and false imprisonment convictions. He also argues that his aggregate sentence of 284 years is cruel and unusual under the United States and California Constitutions, and that it must

---

[1] Defendant alternately goes by the first names "Dennisray" or "Dennis Ray."

be vacated pursuant to recently enacted Senate Bill No. 567 (Senate Bill 567). (Stats. 2021, ch. 731, § 1.3, adding Pen. Code, § 1170, subd. (b)(1) & (2).)[2]

We determine the trial court abused its discretion in one respect but that the error was harmless. We further determine that the sentence is not cruel and unusual, and that, although Senate Bill 567 applies retroactively, reversal for resentencing is not warranted because any error in failing to apply amended section 1170, subdivision (b) was harmless. Accordingly, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The charges

On September 18, 2019, the Santa Clara County District Attorney's Office filed a third amended information charging defendant with 16 separate counts, including: eight counts of aggravated sexual assault on a child under 14 years of age and 10 or more years younger than defendant (§ 269; counts 1-8); five counts of lewd or lascivious acts on a child by force, violence, duress, menace or fear (§ 288, subd. (b)(1); counts 9-13); one count of assault with intent to commit a felony (§ 220, subd. (a)(2); count 14); one count of oral copulation by force, violence, duress, menace or fear on a minor victim 14 years of age or older (former § 288a, subd. (c)(2)(C)[3]; count 15); and one count of sexual penetration by force, violence, duress, menace, or fear of bodily injury on a victim 14 years of age or older (§ 289, subd. (a)(1)(C); count 16).

### B. The trial

The jury trial commenced in May 2019. Toward the end of trial in September 2019, defendant—who was on bail with a $1 million bond—failed to appear. The court

---

[2] Undesignated statutory references are to the Penal Code.

[3] Section 288a has since been renumbered as section 287. (Stats. 2018, ch. 423 (Sen. Bill No. 1494), § 49, eff. Jan. 1, 2019.)

2

subsequently issued a bench warrant for his arrest and the trial proceeded with defendant in absentia.

### 1. Prosecution evidence

#### a. Jane Doe's testimony

Defendant married Carole G. in 2003. Jane Doe is Carole's younger half-sister and was four years old when defendant and Carole married.

Shortly after they married, defendant and Carole moved into a house in Santa Clara (Santa Clara house). Jane Doe lived with her brother and parents at their house in Fremont and they would often visit and sleep over at the Santa Clara house.

Jane Doe testified that when she was around age six, defendant began waking her up in the middle of the night when she stayed at his house, taking her to a different room and making her watch pornographic videos with him. Sometimes he would put his hand on Jane Doe's legs, touch her chest or buttocks, or rub her vagina through her pants. Often he would masturbate while doing so. Other times, defendant put his mouth on Jane Doe's vagina after taking her pants or skirt off. Defendant put his mouth on her vagina between five and 10 times before she was 15 or 16 years old. Jane Doe did not feel that she could say no to defendant because he was an authority figure and she felt obliged to obey him. She was afraid of defendant and had seen him aggressively discipline his children.

More than five times before Jane Doe turned 11, defendant put his hands down her pants and inserted his fingers into her vagina. When Jane Doe told him it felt wrong, defendant said "[i]t's supposed to feel good." Sometimes Jane Doe would cry and defendant would try to quiet her and tell her "it's okay." At least one time, defendant inserted his fingers in Jane Doe's anus while he masturbated and ejaculated. He asked Jane Doe to taste it, but she refused.

One time, Jane Doe was playing a game of hide and seek with defendant and his two children at the Santa Clara house. Defendant found Jane Doe hiding in a closet, at

3

which point he put her on the bed, pulled down her pants and put his mouth on her vagina. He then tried to insert his erect penis into her vagina and penetrated the outer lips. Jane Doe told him to stop because it hurt, and he eventually stopped.

Another time, Jane Doe went into the kitchen in the Santa Clara house and defendant pulled his penis out and told Jane Doe to touch it. Jane Doe refused and defendant pushed her head down towards his penis. Jane Doe managed to resist and left the room.

Jane Doe testified that she did not recall any other incidents after that point until she was 15 or 16, when defendant assaulted her at her house after he had driven over to pick her up and bring her back to the Santa Clara house. On that occasion, he threw her down forcefully on the bed, pinned her down, kissed her and put his mouth on her chest and vagina. Jane Doe screamed for help, so defendant covered her mouth with his hand. He then tried to insert his erect penis into her vagina and penetrated the outer lips. Jane Doe struggled to get away, eventually breaking free and hiding in her mother's bathroom with the door locked. Defendant knocked on the door, apologizing and telling her to come out. After five to 10 minutes, Jane Doe emerged from the bathroom and defendant drove her to the Santa Clara house. Jane Doe stated that she went with defendant because he had said that if she did not, Carole would have asked what had happened or taken so long. Defendant told Jane Doe not to tell anyone about the incident because it would hurt the family; Jane Doe did not say anything about it because she was afraid it would tear her family apart.

One time when Jane Doe was between 10 and 12 years old, she told her mother that defendant had exposed himself to her, but her mother did not go to the police or do anything else with the information.

In May 2016, Jane Doe suffered an anxiety attack. Her mother heard her screaming and crying in her bedroom; when she went into the room, she saw Jane Doe on the floor crying, shaking, hyperventilating, hitting the floor and trying to hurt herself.

4

As her mother attempted to calm her, Jane Doe said, "take me away from him . . . take me away from him." Her mother asked, "Who?" and Jane Doe said defendant's name. Jane Doe testified at trial that at the time of the anxiety attack, she felt that defendant "was coming for" her.

After calling 911, Jane Doe's mother took her to the emergency room. While at the hospital, Jane Doe eventually disclosed to a social worker that she had been sexually abused by defendant. That day or the next, Jane Doe went to the police and informed them about the sexual abuse.

### b. *Pretext phone calls*

Shortly after Jane Doe reported the sexual abuse, the police arranged for her to make two pretext phone calls to defendant.[4] In the first call,[5] Jane Doe said, "there's some stuff that still like bothers me. Well, I don't know like how to say it. It's like what happened to me when I was younger. It's been playing a big part of my life right now and I just need like some closure because it's still affecting me today and I don't know how to deal with it. [¶] . . . [¶] . . . I just like want to know like why? Hello?" Defendant responded, "I'm not sure what you're talking about." Jane Doe said, "I just want to know why you did what you did to me when I was younger . . . there's a bunch of kids in the world that you're around and you did this like to me and it just bothers me." Defendant replied, "Uh, [Jane Doe] I'm at home and um, we're here; everybody's here. So um . . . ."

---

[4] As the investigating officer described it, a pretext call is an investigative tool where the victim calls the suspect and confronts him with the allegations of what occurred, while the call is recorded.

[5] The full transcript of the first call is provided below in the section discussing the challenged adoptive admission. In addition, the audio file of the phone call was played for the jury and is included in the record on appeal.

At that point, defendant attempted to put Carole on the phone and the investigating officer ended the call. Jane Doe then called defendant back; defendant said he would call her back later but never did. Jane Doe and the investigating officer attempted a third pretext phone call on June 24, 2016, but defendant did not answer.

### c. Prior uncharged sex offenses

At trial, the People put on evidence of prior uncharged sex crimes by defendant. Y.Y. Doe testified that defendant raped her in 2002 in a motel room in Beaumont, Texas, when she was 20 years old. Nicole Doe, a friend of defendant's wife, Carole, testified that defendant committed sexual battery against her while watching a movie with her at the Santa Clara house in 2002 or 2003.

### d. The CSAAS evidence

Clinical psychologist Dr. Blake Carmichael testified as an expert on child sexual abuse accommodation syndrome (CSAAS). He testified that CSAAS is an educational tool used to address common myths and misconceptions about how children act as victims of sexual abuse. There are five general categories of CSAAS: secrecy, helplessness, accommodation, delayed or conflicting disclosure, and retraction or recanting. Dr. Carmichael asserted that CSAAS is not a mechanism to determine whether a particular child has been sexually abused. In addition, he testified that he was not familiar with the facts of this case and was not offering an opinion as to whether Jane Doe had been sexually abused.

### 2. Defense evidence

During the cross-examination of Jane Doe, defendant was able to present several prior inconsistent statements. For example, Jane Doe testified at the preliminary hearing that defendant put his mouth on her vagina fewer than five times, as compared to her trial testimony where she claimed it was upwards of 10 times. In addition, Jane Doe initially described the abuse to the social worker at the hospital as only "inappropriate touching," and denied there had been any penetration. Jane Doe also had testified at the preliminary

6

hearing that defendant had not been a factor in her May 2016 anxiety attack, which at the time she claimed stemmed from experiences at school. She further testified that she began having anxiety attacks after her father moved out of the house following her parents' divorce in 2012 or 2013.

Jane Doe's brother testified that he did not recall defendant coming into the room where he and Jane Doe were sleeping and that if she had gotten up or returned to the room in the middle of the night, he would have noticed.

Carole and others testified there was a "half wall" between the hallway and the kitchen and no doors between the kitchen and living room, so that someone could look from the hallway or living room into much of the kitchen, thereby casting doubt on Jane Doe's allegations of sexual abuse that took place in the kitchen.

Defendant's son testified that Jane Doe frequently had temper tantrums during which she would cry, throw things, hit people, and fall to the ground. Jane Doe had initially testified that since making the accusations against defendant, she had not spoken with her sister or her sister's children, but later admitted that was not true.

Several of defendant's family members testified that Jane Doe had never indicated she did not want to be around defendant and they believed Jane Doe was not honest.

### 3. Prosecution rebuttal evidence

On September 18, 2019, almost a week before the case was submitted to the jury, defendant failed to appear for trial. The parties stipulated that defendant had been "released from Santa Clara County jail on a million dollar bond. [¶] On Wednesday, September 18th, 2019 [defendant's] bail bond [was] forfeited because the defendant failed to appear in court for the jury trial." A Santa Clara Police Department detective

7

assigned to the fugitive apprehension team testified that he began looking for defendant on September 18 and thereafter had been unable to locate him.[6]

The parties also stipulated that on June 9, 1993, defendant was convicted of felony robbery and false imprisonment.

### C. *The verdict, apprehension, and sentencing*

On September 26, 2019, the jury returned its verdict, finding defendant guilty on all counts. In a bifurcated proceeding, the jury also found true a prior strike conviction of felony robbery by defendant in violation of sections 211 and 212.5, subdivision (b), to which prior conviction the parties had stipulated.

In early 2020, defendant was located abroad, transported back to the United States, and arrested on the bench warrant.

In November 2020, the trial court sentenced defendant to a total determinate term of 44 years eight months in prison, consisting of: 20 years (the upper term of 10 years, doubled) on count 15; 20 years (the upper term of 10 years doubled) on count 16; and four years eight months (one-third of the middle of 14 years (seven years, doubled)) on count 14. The court sentenced defendant to a total indeterminate term of 240 years, consisting of 30-years-to-life terms (15 years, doubled) for counts 1 through 8. The court imposed but stayed a term of 16 years on counts 9 through 13 pursuant to section 654.

Defendant timely appealed.

---

[6] Prior to deliberation, the trial court instructed the jury regarding defendant's absence: "If the defendant fled . . . after [he] was accused of committing the crime, that conduct may show that he was aware of [his] guilt. If you conclude that the defendant fled . . . , it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled . . . cannot prove guilt by itself." (CALCRIM No. 372.)

## II. DISCUSSION

### A. Standards of review

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717 (*Waidla*).) A court has broad discretion under Evidence Code section 352 to exclude relevant evidence if it determines the probative value is substantially outweighed by its possible prejudicial effects. (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*), citing *People v. Clark* (2011) 52 Cal.4th 856, 893.) "We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Merriman*, at p. 74, quoting *People v. Brown* (2003) 31 Cal.4th 518, 534.) Generally, the application of ordinary rules of evidence does not implicate the federal Constitution; accordingly, we review allegations of error under the "reasonable probabilit[y]" standard of *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*), unless the erroneous admission of evidence affects the fundamental fairness of the trial, in which case we apply the de novo standard of review. (*People v. Marks* (2003) 31 Cal.4th 197, 227; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.)

Whether a punishment is cruel or unusual is a question of law subject to our independent review, "but underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82.)

### B. Admission of pretext phone call

Defendant argues the trial court committed prejudicial error by admitting the pretext phone call as evidence that he made an adoptive admission. Specifically, he contends Jane Doe's accusations were too vague for defendant to understand that she was referring to sexual abuse. As explained below, we need not decide whether the trial court abused its discretion by admitting the pretext call because we determine that any error in doing so was harmless.

9

### 1. Background

Before trial, the People brought a motion in limine to admit the pretext phone calls from Jane Doe to defendant as evidence of an adoptive admission by defendant. The People argued that Jane Doe had confronted defendant "about what he had done to her and he [did] not deny any wrongdoing." Instead, they contended, defendant went silent, avoided responding directly, and passed the phone off to Carole. The People emphasized that the audio recording of the call revealed defendant's silence and change in tone after Jane Doe's accusation, elements not evident in the transcript. In addition, the People noted that defendant continued to avoid Jane Doe and failed to contact her after the pretext calls, which showed that "he [knew] exactly why she [was] confronting him."

Defendant argued that Jane Doe's comments were too vague and did not indicate what she was referring to. He even stated during the call that he did not know what she was talking about. Defendant argued that, "to be an adoptive admission, there has to be some indication that the defendant understood or knew that the topic of conversation" was the alleged misconduct.

The trial court granted the motion over defendant's opposition. The transcript of the pretext call was then admitted into evidence and the audio of the call was played for the jury.

The full transcript of the first pretext call is as follows:

"[Defendant]: Hello.

"[Jane Doe]: Hello.

"[Defendant]: Hi, who is this?

"[Jane Doe]: This is [Jane Doe].

"[Defendant]: Oh, hi. I'm sorry. How are you doing?

"[Jane Doe]: Good. How are you?

"[Defendant]: I don't have you [*sic*] number, so I don't know, so . . .

"[Jane Doe]: Well, I got—I got my number changed.

10

"[Defendant]:  Oh, cool.

"[Jane Doe]:  Yeah.

"[Defendant]:  And so, what are you doing?

"[Jane Doe]:  I'm just sitting in my room.

"[Defendant]:  Okay.

"[Jane Doe]:  Did you uh—

"[Defendant]:  Um-hum.

"[Jane Doe]:  —did you hear what happened to me?

"[Defendant]:  I heard you um, had uh—couldn't sleep or something.  You had something.  I don't know.  What's up?

"[Jane Doe]:  Well, I had an anxiety attack the other day.

"[Defendant]:  Yeah, somebody tried to call me from the ER at night real late and I saw the—I didn't see the missed call until the next day, so . . .

"[Jane Doe]:  I think they had you listed as an emergency contact or something.

"[Defendant]:  Oh, okay.  I was wondering about that.  I was like—you know uh, yeah, so I didn't even know I had a call until the morning.  So, how are you doing?

"[Jane Doe]:  Um, I'm okay.  But there's like (inaudible) that's just bugging me.

"[Defendant]:  How's school?  Huh?

"[Jane Doe]:  Um, school is good. It's all right.

"[Defendant]:  So, you're doing better?

"[Jane Doe]:  I'm okay.  But there is like—there's some stuff that still like bothers me.  Well, I don't know like how to say it.  It's like what happened to me when I was younger.  It's been playing a big part of my life right now and I just need like some closure because it's still affecting me today and I don't know how to deal with it.

"[Defendant]:  Humph?

"[Jane Doe]:  I just like—I just like want to know like why?  Hello?

"[Defendant]:  Um-hum.  I'm not sure what you're talking about.

11

"[Jane Doe]: I just want to know why you did what you did to me when I was younger.

"[Defendant]: Well, ummmm.

"[Jane Doe]: I just like—there's a bunch of kids in the world that you're around and you did this like to me and it just bothers me.

"[Defendant]: Uh, [Jane Doe]. [Jane Doe] um, I'm at home and um, we're here; everybody's here. So um . . .

"[Jane Doe]: Um-hum. Well, I don't want to tell anyone, so I just wanted to know like why and I just want closure right now and it's—

"[Defendant]: Yeah, hold on. I'm sorry, but um—[Jane Doe], hold on a second. Your sister is here. She wants to talk to you.

"[Jane Doe]: Okay.

"[Defendant]: Okay? Do you want to talk to her?

"[Jane Doe]: Huh?

"[Defendant]: Here. Hold on a second. No she just called me. Hey, here."

As noted above, the audio recording of the pretext call was also played for the trial court and subsequently the jury. The audio file, included in the record on appeal, contains certain aspects not reflected in the written transcript, such as tone, inflection, and pace. The People argue the audio of the pretext call shows that defendant understood Jane Doe's accusations.

After the close of evidence, the trial court instructed the jury with CALCRIM No. 357 regarding the pretext call: "If you conclude that someone made a statement outside of court that accused the defendant of a crime and the defendant did not deny it, you must decide whether each of the following is true: [¶] [(1)] the statement was made to the defendant; [¶] [(2)] the defendant heard and understood the statement; [¶] [(3)] the defendant would[,] under all the circumstances[,] naturally have denied the statement if he thought it was not true; and [¶] [(4)] the defendant could have denied it but did not. [¶]

12

If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. If you decide that any of these requirements has not been met, you must not consider the statement or the defendant's response for any purpose."

### 2. *Applicable law*

Evidence of a statement by someone other than a witness testifying at the hearing and offered to prove the truth of the matter stated is generally inadmissible hearsay. (Evid. Code, § 1200, subds. (a), (b).) However, "[e]vidence of a statement offered against a party is not inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221; *Waidla*, *supra*, 22 Cal.4th at p. 717.)

Accordingly, " ' " '[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' " ' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 789-790.)

" 'In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true.' " (*People v. Charles* (2015) 61 Cal.4th 308, 322-323 (*Charles*).)

" 'For the adoptive admission exception to the hearsay rule to apply, no "direct accusation in so many words" is necessary. [Citation.] Rather, it is enough that the evidence showed that the defendant participated in a private conversation in which the

13

crime was discussed and the circumstances offered him the opportunity to deny responsibility or otherwise disassociate himself from the crime, but that he did not do so.' " (*Charles*, *supra*, 61 Cal.4th at p. 323.)

Trial courts have "broad discretion to determine whether a party has established the foundational requirements for a hearsay exception [citation] and '[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto . . . .' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.) " ' "To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide." ' " (*People v. Zavala* (2008) 168 Cal.App.4th 772, 779.) "We review the trial court's conclusions regarding foundational facts for substantial evidence . . . [and] [w]e review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*DeHoyos*, *supra*, at p. 132.)

### 3. *Analysis*

We need not decide whether the trial court abused its discretion because, even assuming error, we conclude it was harmless. Erroneous admission of the pretext call only requires reversal if we determine it was prejudicial because it is reasonably probable the outcome would have been different had it not been admitted. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Defendant argues admission of the evidence rendered his trial fundamentally unfair so that it violated his federal due process rights and therefore the more stringent federal test for harmless error applies. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [error must be harmless beyond a reasonable doubt]; *People v. Falsetta* (1999) 21 Cal.4th 903, 913 (*Falsetta*) ["The admission of relevant evidence

14

will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair."].)

We do not agree that admission of the pretext call rendered the trial fundamentally unfair and we find any error harmless under *Watson*.[7] (*People v. Chism* (2014) 58 Cal.4th 1266, 1298 [erroneous admission of evidence at guilt phase is reviewed under *Watson* standard]; *People v. Albarran*, *supra*, 149 Cal.App.4th at p. 229 [" 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process[;] [e]ven then, the evidence must "be of such quality as necessarily prevents a fair trial." ' "].)

Under *Watson*, we ask whether there is a reasonable chance—more than an abstract possibility but not necessarily " 'more likely than not' "—that a result more favorable to defendant would have been reached absent the assumed error. (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1041.) "In assessing prejudice, we consider both the magnitude of the error and the closeness of the case." (*Ibid.*)

Here, there was overwhelming evidence of defendant's guilt even without the pretext call. Jane Doe testified at length and in detail about the history of sexual abuse by defendant, including numerous specific instances from age six to age 15 or 16. Portions of Jane Doe's testimony were also corroborated by her mother, who recounted that Jane Doe had told her defendant exposed himself to Jane Doe, and that during the 2016 anxiety attack, Jane Doe said, "take me away from him . . . take me away from him," referring to defendant. In addition, the hospital social worker testified that Jane Doe disclosed she had been sexually abused by defendant.

---

[7] Although we determine the *Watson* standard applies here, even under the federal standard in *Chapman*, we would determine beyond a reasonable doubt that it did not affect the outcome of the trial. (*People v. Cook* (2006) 39 Cal.4th 566, 608; *Chapman, supra,* 386 U.S. at p. 24.)

The jury also heard the evidence of prior uncharged sex offenses by defendant against Y.Y. Doe and Nicole Doe, which evidence the jury could consider in determining whether defendant "committed the sexual assaults . . . in counts 1 through 16." (Evid. Code, § 1108, subd. (a).) And the trial court instructed the jury with CALCRIM No. 357, informing them that they must decide in the first instance if the statement accused defendant of a crime and if defendant understood it.

Lastly, defendant fled during the trial and the jury was instructed that "[i]f the defendant fled after he was accused of committing the crime[,] that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." The defendant's decision to flee toward the conclusion of the jury trial could properly be considered by the jury as consciousness of guilt. (*People v. Carrera* (1989) 49 Cal.3d 291, 314.) Accordingly, it is not reasonably probable the outcome would have been different absent the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant argues that the admission of the pretext call was not harmless, in light of numerous conflicts within Jane Doe's testimony. For example, Jane Doe first testified at the preliminary hearing that defendant put his mouth on her vagina "less than five times," but then testified at trial that he had done so between five and 10 times. In addition, Jane Doe's brother testified that he did not recall defendant coming into the room where he and Jane Doe slept at the Santa Clara house and that, had Jane Doe "gotten up or returned to the room in the middle of the night, he would have noticed."[8]

_____

[8] Defendant also argues: conflicting evidence of the layout of the Santa Clara house cast doubt on Jane Doe's assertions that he sexually abused her in the kitchen; Jane Doe initially described the sexual abuse as "inappropriate touching" and denied that there had been any penetration; Jane Doe testified at the preliminary hearing that defendant was not a factor in her anxiety attack; Jane Doe began having anxiety attacks when her parents divorced in 2012 or 2013; Jane Doe frequently had temper tantrums; Jane Doe (continued)

Upon our careful review of the trial record, we do not find that these and other claimed inconsistencies undermine the substantiality of the evidence. Jane Doe testified that her memory and ability to recollect the incidents of sexual abuse improved between the preliminary hearing and trial, enabling her to clarify that defendant had put his mouth on her vagina between five and 10 times. Similarly, Jane Doe's brother in fact testified that, although he would have noticed it at the time, he could not recall and had no memory of Jane Doe coming back into the bedroom late at night. But he did not testify that it never happened.

Defendant's other characterizations of, and citations to, the evidence are similarly unavailing. Any error was harmless.

### C. Admission of uncharged sex offenses

Defendant contends the trial court abused its discretion by admitting evidence of the uncharged sex offenses against Y.Y. Doe and Nicole Doe, under Evidence Code sections 1101, subdivision (b), and 1108, subdivision (a). According to defendant, the uncharged offenses were too remote in time and not sufficiently similar to the charged offenses against Jane Doe.

As we explain below, we conclude the trial court did not abuse its discretion in admitting the evidence pursuant to Evidence Code section 1108, subdivision (b); accordingly, it cannot be inadmissible under Evidence Code section 1101. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827 (*Daveggio*); Evid. Code, § 1108, subd. (a) [evidence admissible under § 1108, subd. (a) "is not made inadmissible by Section 1101"].)

---

provided conflicting testimony regarding whether she had spoken with her sister or her sister's children after she accused defendant; and, three of Jane Doe's family members testified they thought she was not honest.

### 1. *Procedural background*

Prior to trial, the People filed a motion in limine to admit evidence of defendant's uncharged sex offenses against Y.Y. Doe and Nicole Doe.  In the motion, the People argued the evidence would show that "[i]n the early morning hours of August 21, 2002, just a few years before he began molesting [Jane Doe], Defendant raped 20-year old [Y.Y. Doe] in a motel room in Beaumont, Texas."  In addition, they argued the evidence would show that a year or two before that, defendant committed a sexual battery on his wife's friend, when he invited 21-year-old Nicole Doe over to his house to watch a movie while his wife was out of town.  "After watching the movie, Nicole was getting ready to leave when Defendant grabbed Nicole, put his hand underneath her sweater and touched her breasts against her will.  Defendant tried to kiss Nicole, but she stopped him, ran out of the house to her car, and drove home."

The People argued the evidence was admissible pursuant to Evidence Code section 1108 to show defendant's propensity to commit sexual offenses, and pursuant to Evidence Code section 1101, subdivision (b), to prove intent and lack of mistake.  Defendant objected, arguing the uncharged offenses were insufficiently similar.

The trial court ultimately ruled that the evidence was admissible, determining under Evidence Code section 352 that it was not substantially more prejudicial than probative.  The court issued a lengthy explanation of its holding, finding the incidents to be sufficiently similar and not too inflammatory to warrant admission.  The court also issued a modified limiting instruction to the jury before the victims testified at trial:  "The People will present to you evidence that the defendant committed a crime or a charge that is not charged in this case. . . . [¶] . . . [¶] If you decide that the defendant committed the other sexual offense, you may consider that evidence and weigh it together with all the other evidence received during the trial to help you determine whether the defendant committed the charged offense. Remember, however, that the evidence of another sexual

18

offense is not sufficient alone to find the defendant guilty of the charged offenses in this case. The People still must prove their case beyond a reasonable doubt."

The victims then testified at trial as follows.

### a. Y.Y. Doe

In 2002, Y.Y. Doe worked as a childcare provider at a gym in Beaumont, Texas. She met defendant when he dropped his son off at the gym's childcare facility. She agreed to go out with defendant the next day, at which time defendant convinced her to go to a motel room. Once inside the room, defendant began kissing her, and touching her breasts and legs. She told him to stop touching her; he initially stopped, but then resumed and soon tried to pull down her pants.

She attempted to stop him with both hands, and defendant said he wanted to touch her vagina. She resisted, but defendant was able to pull her pants down about halfway and touch her vagina. Y.Y. Doe began to scream and tell him to stop, but defendant continued, pulled down her underwear and inserted his penis into her vagina. She was pinned beneath defendant, unable to move.

At some point, defendant removed his penis from her vagina, after which he began to apologize to Y.Y. Doe. She went to the bathroom, and when she came out, defendant began kissing her and attempted to insert his penis into her vagina again, but she managed to resist. Y.Y. Doe said she had to leave, and defendant asked if he could walk her to her car. He walked her to her car, and she drove home. As she was driving home, defendant called her, and she told him never to call her again.

### b. Nicole Doe

Nicole Doe was a friend of defendant's wife, Carole. In 2002 or 2003, while Carole was out of town, defendant invited Nicole over to his house to watch a movie with him. When the movie was over, defendant tried to kiss and touch Nicole and tried to have sex with her. They had been sitting on the couch when defendant turned to Nicole

19

and attempted to kiss her. He also put his hand under her sweater and tried to touch her breasts. Nicole was able to pull away and she quickly left the house and drove home.

### 2. *Applicable law*

Evidence Code section 1108 is an exception to the general rule that "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Evidence that a defendant committed a sexual offense is admissible character evidence in a "criminal action in which the defendant is accused of a sexual offense," as long as the evidence is not inadmissible under Evidence Code section 352. (Evid. Code, § 1108, subd. (a).)

A trial court "must engage in a careful weighing process" when determining whether to admit evidence under Evidence Code section 1108. (*Falsetta*, *supra*, 21 Cal.4th at p. 917; *People v. Baker* (2021) 10 Cal.5th 1044, 1098.) "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, at p. 917.)

"In determining whether the trial court abused its discretion, we must focus on what the court was made aware of at the time it ruled on the motion, not on evidence that came out or circumstances that took place during the trial." (*People v. Fruits* (2016) 247 Cal.App.4th 188, 208.)

20

### 3. *Analysis*

The trial court's exercise of its discretion to admit the uncharged sex offenses against Y.Y. Doe and Nicole Doe was not arbitrary, capricious or patently absurd such that it resulted in a manifest miscarriage of justice. (*Merriman*, *supra*, 60 Cal.4th at p. 74.)

In determining whether to admit these uncharged sex offenses, the court noted the similarities between the incidents, in particular the allegations of forcible rape against Y.Y. Doe and Jane Doe. In both instances, defendant was accused of forcibly pinning down the victim on the bed, removing her pants and underwear, forcibly orally copulating her, and then inserting his penis in her vagina. In both instances, defendant eventually stopped and then repeatedly apologized to the victim.

In all three instances—Y.Y. Doe, Nicole Doe, and Jane Doe—defendant attained a certain level of trust with the victims, which enabled him to be alone with them at the time of the sexual abuse. Y.Y. Doe agreed to go to a hotel room with defendant, Nicole Doe agreed to join defendant alone at his house to watch a movie, and defendant was a family member and care provider for Jane Doe.

The trial court acknowledged that there were various differences between the incidents as well. For instance, defendant was an adult authority figure whom Jane Doe felt she had to obey and trust. For that reason, the breach of trust with Jane Doe was of a different nature. In addition, while Y.Y. Doe and Nicole Doe were both around 20 years old at the time of their incidents, defendant began sexually abusing Jane Doe when she was just six, although the alleged rape occurred when she was 15 or 16. The court also recognized that the incidents with Y.Y. Doe and Nicole Doe had occurred 20 and 17 years earlier, respectively, and had not resulted in convictions. Lastly, the trial court considered the inflammatory nature of Y.Y. Doe's testimony, in particular whether it would uniquely tend to invoke an emotional bias against defendant. (Evid. Code, § 352.)

21

Nevertheless, the court determined that the similarities were sufficient for purposes of Evidence Code sections 1108 and 352, and that it would issue the limiting instruction set forth above.

Defendant argues that the trial court abused its discretion because the alleged incidents were insufficiently similar. Specifically, he argues that "being alone was a factor that had no significance"; "[t]he trust that was allegedly involved in the charged offenses was significantly different"; "[t]he conduct that was alleged also was not that similar"; the age difference was significant; the Y.Y. Doe and Nicole Doe incidents were too remote in time; and, the limiting instruction "could not reasonably be expected to prevent" an emotional reaction against defendant.

However, the trial court acknowledged and considered all of the differences that defendant identifies. The court merely determined that, despite those differences, the prior uncharged offenses were relevant and "highly probative of the defendant's propensity to commit sexual offenses" and not unduly prejudicial. The court properly engaged in the careful weighing process required by Evidence Code section 352, and appropriately considered the *Falsetta* factors. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)

Again, we cannot say the trial court's exercise of its discretion in this regard was arbitrary, capricious or patently absurd, or resulted in a manifest miscarriage of justice. (*Merriman*, *supra*, 60 Cal.4th at p. 74.) Accordingly, we conclude the trial court did not abuse its discretion by admitting the evidence pursuant to Evidence Code section 1108.[9]

### D. Admission of CSAAS evidence

Defendant argues the trial court abused its discretion by (1) admitting the CSAAS evidence because it is unreliable and "no longer necessary to disabuse jurors of

---

[9] As noted above, evidence of the defendant's commission of other sexual offenses is not made inadmissible by Evidence Code section 1101 if the evidence is not inadmissible pursuant to Evidence Code section 352. (*Daveggio*, *supra*, 4 Cal.5th at p. 827.)

misconceptions about how child sexual abuse victims can be expected to react," and (2) improperly refusing to preclude the use of Dr. Carmichael's testimony to prove the profile of a child molestation victim. In addition, he argues Dr. Carmichael's testimony exceeded the bounds of permissible CSAAS evidence because he "described a scientific framework on which the jurors could pigeonhole the facts of [defendant's] case and accept the suggestion that alleged victims are credible in spite of inconsistencies in their testimony." Defendant contends that error was compounded when the trial court instructed the jury with CALCRIM No. 1193, which he claims "sanctioned the use of the evidence for the improper purpose of corroborating [Jane Doe's] claims."

As we explain below, we conclude defendant's arguments lack merit.

### 1. *Procedural background*

Before trial, the People filed a motion in limine to admit expert testimony regarding CSAAS under Evidence Code sections 720 and 801 through 805, to disprove common myths and misconceptions about children's reactions to sexual abuse. The People argued the testimony would "not be offered to prove that a sexual assault occurred, and the admonition provided in the jury instructions (See CALCRIM 1193) will prevent the jury from considering the testimony for any impermissible purpose."

Defendant filed a motion in limine to exclude and limit CSAAS evidence, arguing that "[c]urrent empirical research reveals that CSAAS is predicated on a fallacy and must be excluded," and that the testimony is unnecessary because the subject is no longer beyond the common experience of the jurors. The court heard argument and granted the People's motion to allow the testimony, stating that the proffered expert testimony is beyond the common experience of the jurors and should be allowed.

At trial, the People put on Dr. Carmichael as an expert in CSAAS. He testified that CSAAS was developed in the early 1980s as an educational tool to address myths and misconceptions about how children should act as victims of sexual abuse. There are

five general categories of CSAAS: secrecy, helplessness, accommodation, delayed or conflicting disclosure, and retraction or recanting.

The vast majority of sexual abuse of children is committed by people the children know and trust. The perpetrators rely on the fact the abuse takes place in secret to maintain sexual access to the child, often through coercive or punitive ways, like threatening the child if he or she discloses the abuse. The perpetrators are also usually bigger, stronger and more physically imposing than the children, often with a trust or authority relationship, resulting in an imbalance of power that leaves the child helpless to ward off or disclose the abuse.

Child sexual abuse victims typically feel trapped and will often take steps to accommodate or attempt to cope with the abuse by altering their routines, such as walking around the house differently, avoiding areas where the abuse occurred, or finding a way to get home later after school. At the same time, it is not uncommon for children to acquiesce and not resist the abuse, hoping that it will end more quickly.

Dr. Carmichael testified that research shows that upwards of 60 to 75 percent of sexually abused children do not disclose the abuse within the first year. In addition, children often have difficulty remembering the details of the abuse the more frequently it occurred, thereby resulting in conflicting or unconvincing disclosures. Similarly, because children will likely be afraid of how their disclosure will be received, they often provide a "soft disclosure" where they do not share the full scope of the abuse. Lastly, he testified that between 18 and 24 percent of children will recant their disclosures of sexual abuse.

Dr. Carmichael clarified that CSAAS is not a mechanism to determine whether a particular child has been sexually abused. In addition, he testified that he was not familiar with the facts of this case and was not offering an opinion as to whether Jane Doe had been sexually abused.

After the close of evidence, the trial court instructed the jury with CALCRIM No. 1193 regarding Dr. Carmichael's testimony: "You have heard testimony from

24

Dr. Blake Carmichael regarding child sexual abuse accommodation syndrome. Dr. Carmichael's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [Jane Doe's] conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of her testimony."

### 2. Applicable law

"Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law [that] CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see also *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301; *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116-117.)

### 3. Analysis

Defendant argues that the trial court abused its discretion because "CSAAS evidence is unreliable and no longer necessary to disabuse jurors of misconceptions about how child sexual abuse victims can be expected to react." In light of the considerable precedent set forth above regarding admissibility of CSAAS evidence, we conclude the trial court did not abuse its discretion when it ruled that the People's proposed expert testimony on CSAAS was relevant and admissible. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 172; *Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745; *People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

Defendant also asserts the trial court erred by refusing to issue an order precluding the People from using Dr. Carmichael's testimony to "prove the profile of a child molestation victim," and that the testimony "exceeded the scope of permissible CSAAS testimony."

We disagree. Dr. Carmichael testified that he did not know Jane Doe, defendant, the charges or facts of this case. He testified to the five general categories of CSAAS and explained that "there is no checklist . . . no one thing or set of things that can be used to determine or tell if a kid was abused." We do not view his testimony as having proved defendant's guilt based on a match with a profile. (See *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1086-1087.) Instead, as the trial court instructed the jury, his testimony was *not* evidence defendant committed any of the crimes, and may only have been considered in deciding whether Jane Doe's conduct was not inconsistent "with the conduct of someone who has been molested in evaluating the believability of her testimony."

Defendant also argues Dr. Carmichael's testimony exceeded the bounds of permissible CSAAS evidence. Specifically, he claims Dr. Carmichael "engaged in the prohibited practice of giving 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply it to the facts of the case and conclude that a child had been sexually abused," and by drawing too many parallels to the facts of this case.

Again, we disagree. As set forth above, Dr. Carmichael testified to the five general categories of CSAAS and expressly stated that he had no knowledge of the facts of this case. Defendant analogizes to *People v. Bowker* (1988) 203 Cal.App.3d 385, but we find the case distinct. In *Bowker,* the prosecutor led the expert on a "testimonial excursion" that far exceeded the permissible limits. (*Id.* at p. 394.) The unacceptable testimony "was replete with comments designed to elicit sympathy for child abuse victims and solicitations that children should be believed." (*Ibid.*) Further, "the picture

26

painted by [the expert] happened to be of the two children in the case." (*Ibid*.) The expert had stepped into the shoes of the victims by asking, " 'Why are they taking me away from my mom?,' " which hypothetical question "directly coincided [with] the fact that as a result of the investigation [the children] were removed from their mother's home and placed in foster care." (*Ibid*.) "He expressed how frightening it was 'for a child to come into *this* courtroom, and I know they have to, and tell their story.' " (*Ibid*.) Dr. Carmichael's testimony did not resemble the expert in *Bowker* in this regard.

Defendant also argues the trial court erred in issuing CALCRIM No. 1193. Specifically, he contends the last phrase of the instruction—"in evaluating the believability of her testimony"—is an incorrect statement of law and should be stricken to preclude the jury from improperly using the evidence to determine whether the alleged abuse occurred. (See *Patino*, *supra*, 26 Cal.App.4th at p. 1744 ["CSAAS testimony is inadmissible to prove that a molestation actually occurred"].)

We consider the claim forfeited, as defendant did not object to the instruction below. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011.) Defendant argues the rule of forfeiture does not apply because the instruction was an incorrect statement of law. (*Ibid*.) Yet, even if we deem that this claim has not been forfeited, numerous courts have recently upheld CALCRIM No. 1193 as accurately informing jurors on the limited use of CSAAS evidence and have rejected challenges to the instruction. (See *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175-176 [citing *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504 and *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474].) We agree with the conclusions of those courts.

Lastly, defendant contends the admission of the CSAAS evidence violated his due process rights. Generally, though, a court's compliance with the rules of evidence does not violate a defendant's right to due process. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174, citing *People v. Hall* (1986) 41 Cal.3d 826, 834-835.) Reviewing courts have also routinely held the admission of CSAAS evidence does not violate due process.

(See, e.g., *Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745 [trial court's admission of CSAAS evidence did not violate due process].) For the same reasons, we conclude that Dr. Carmichael's testimony about CSAAS did not violate defendant's constitutional right to due process.

### E. Prevention of cross-examination

Defendant argues the trial court erred when it precluded him from showing through cross-examination of Dr. Carmichael that children who make untruthful allegations of sexual abuse also can exhibit the characteristics of CSAAS. He contends the trial court's ruling prevented him from effectively challenging the impression created by the CSAAS evidence that alleged victims of child sexual abuse who exhibit the characteristics of CSAAS necessarily are truthful.

The People argue that defense counsel failed to lay the proper foundation for the cross-examination and the trial court properly restricted it because the People had been precluded from questioning Dr. Carmichael about the same topic.

As explained below, we determine the trial court did not abuse its discretion by limiting the scope of defendant's cross-examination of Dr. Carmichael on this subject.

### 1. Procedural background

Prior to trial, defendant filed a motion in limine to exclude evidence of statistical evidence or studies regarding false reporting or accusations of child sexual abuse. The People did not oppose that aspect of the motion, stating that they did not seek to admit such evidence; accordingly, the trial court granted defendant's motion. During cross-examination of Dr. Carmichael at trial, defense counsel sought to ask him about whether children who lie about having been sexually abused exhibit similar characteristics as victims who delay reporting. The People objected and the trial court held a hearing pursuant to Evidence Code section 402. The court then ruled that it would exclude the line of questioning about false reporting because defendant had successfully sought to exclude such evidence before trial.

28

## 2. Analysis

Defendant argues the proposed line of cross-examination was "not of the same character" as the excluded evidence, but instead "merely sought to establish that alleged child sexual abuse victims can exhibit behavior that has the components of CSAAS and not necessarily be truthful."

We cannot conclude that the trial court abused its discretion in ruling to the contrary. (*Waidla*, *supra*, 22 Cal.4th at p. 717.) Defendant sought to preclude the People from introducing testimony regarding false accusations. Yet, during cross-examination, defense counsel herself sought to elicit testimony regarding false accusations. Even if the line of questioning defense counsel sought to pursue in cross-examination of Dr. Carmichael was not identical to the nature of the testimony defendant had successfully moved to exclude before trial, they were similar enough that it was within the scope of the trial court's discretion to rule as it did.

Defendant claims Dr. Carmichael's testimony created the impression that if Jane Doe had the characteristics of CSAAS, "she probably was truthful." But that is mere speculation by defendant and he cites no authority for that assertion. Moreover, Dr. Carmichael testified CSAAS is not a mechanism to determine whether a particular child has been sexually abused, he was not familiar with the facts of this case, and he was not offering an opinion as to whether Jane Doe had been sexually abused. Defendant was also free to argue and put on evidence—and did—that Jane Doe was not telling the truth.

### F. Prior robbery and false imprisonment convictions

Defendant argues the trial court committed prejudicial error when it overruled his objections to the admission of evidence of his prior robbery and false imprisonment convictions pursuant to Evidence Code section 1103, subdivision (b). The People acknowledge that defendant's arguments are "well-taken," but contend any error was harmless.

We agree that any error was harmless.

29

### 1. Procedural background

Prior to trial, in considering possible testimony about past violence by Jane Doe against her younger brother, the court ruled that it would not allow evidence of Jane Doe's past violent acts, deeming them irrelevant and prejudicial under Evidence Code section 352. Nevertheless, during trial, defendant's son testified that throughout Jane Doe's childhood, she would throw fits when she was upset or did not get her way, including hitting and throwing things.

In response, the People argued that the testimony opened the door for evidence of defendant's capacity for violence. The trial court agreed, explaining that, "based upon his testimony and the way the question was addressed to him, that the same kind of violent behavior, that is hitting, occurred over a period of time rather than maybe one instance of hitting people is sufficient to open the door." Accordingly, on cross-examination of defendant's brother, the People asked him if he was aware that defendant had previously been convicted of robbery and false imprisonment, and accused of rape. The parties then stipulated before the jury that defendant had been convicted of the felonies of robbery and false imprisonment.

### 2. Applicable law

Evidence of a person's character is generally not admissible to prove his or her conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) However, evidence of a victim's character is admissible when offered by the defendant to prove conduct of the victim in conformity with that character trait. (Evid. Code, § 1103, subd. (a)(1); *People v. Fuaiva* (2012) 53 Cal.4th 622, 696 (*Fuaiva*).) Moreover, where evidence that the victim had a character for violence has been introduced by the defendant under Evidence Code section 1103, subdivision (a)(1), the prosecution may in turn offer evidence of the defendant's character for violence to prove conduct of the defendant in conformity with that character trait. (Evid. Code, § 1103, subd. (b).) Thus, "if . . . a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to

infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that . . . the defendant was a violent person, from which the jury might infer it was the defendant who acted violently." (*Fuaiva*, at p. 696.)

Such reciprocal evidence often occurs in a self-defense context: "[If] a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that (1) the victim was not a violent person and (2) the defendant was a violent person, from which the jury might infer it was the defendant who acted violently." (*Fuaiva*, *supra*, 53 Cal.4th at p. 696; see also *People v. Tackett* (2006) 144 Cal.App.4th 445, 453 ["common law established that where self-defense was claimed in a prosecution for a crime involving violence, evidence of the alleged victim's violent and aggressive character could be introduced in support of the claim of self-defense"].)

### 3. Analysis

We agree with the parties that reciprocal provisions of Evidence Code section 1103, subdivision (b), were not triggered because the testimony of defendant's son regarding Jane Doe's tantrums was not offered for self-defense or otherwise to justify defendant's conduct toward Jane Doe during the charged offenses.

However, we also agree with the People that the error was harmless. First, evidence of defendant's alleged rape of Y.Y. Doe was separately admitted. Second, as the People point out, the testimony regarding defendant's prior convictions was extremely brief and did not include details of the offenses. And third, as noted above, there was substantial evidence in the record of defendant's guilt for the charged offenses and flight during trial; accordingly, we cannot say it is reasonably probable that defendant would obtain a more favorable result without the evidence of the prior convictions. (*People v. Westerfield* (2019) 6 Cal.5th 632, 700; *Watson*, *supra*, 46 Cal.2d 818.)

31

Defendant notes that "[t]he admission of any evidence that involves crimes other than those for which a defendant is being tried has a 'highly inflammatory and prejudicial effect' on the trier of fact." (*People v. Thompson* (1980) 27 Cal.3d 303, 314, fn. omitted, overruled on another ground by *People v. Rowland* (1992) 4 Cal.4th 238, 260.) While that general proposition is true, it does not follow that in every instance, error in admitting such evidence was prejudicial. (See, e.g., *People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

Here, we conclude the error was harmless.[10]

### G. *Cumulative error*

Defendant argues that cumulative prejudice from the trial court's errors requires reversal. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.)

" 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1217.) Considering the reasons explained above for the lack of prejudice as to the one error we

---

[10] At oral argument, defense counsel argued for the first time that the trial court did not issue a limiting instruction regarding evidence of the prior convictions, although he did not specify what instruction should have been provided. We consider the point forfeited, as it was not raised in the trial court or in briefing on appeal. (*People v. Valdez* (2012) 55 Cal.4th 82, 149 ["a defendant who fails to ask the trial court to give a limiting instruction may not raise the issue on appeal"]; *People v. Clark*, *supra*, 52 Cal.4th at p. 942 ["Because defendant failed to request a limiting instruction below, he has forfeited his claim that it was error for the court not to so instruct."]; *People v. Carrasco* (2014) 59 Cal.4th 924, 990 [fairness militates against considering issue first raised at oral argument].)

have identified, and even assuming error in admission of the pretext call, we determine the errors do not compound to amount to a miscarriage of justice.

### H. Cruel and unusual punishment sentence

Defendant argues his sentence of 284 years eight months to life constitutes cruel and unusual punishment in violation under the Eighth Amendment of the federal Constitution and article I, section 17, of the California Constitution. He contends the aggregate sentence is so extreme that it shocks the conscience and offends fundamental notions of human dignity, and is grossly disproportionate to his crimes.

"Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Punishment is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity." (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fns. omitted; see also *Ewing v. California* (2003) 538 U.S. 11, 20, 23 (*Ewing*).)

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing*, *supra*, 538 U.S. at p. 20, quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 996-997.) " 'The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Ewing*, at p. 23.)

California's Constitution imposes a similar standard. "[I]n California, a punishment may violate . . . the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, superseded by statute on another ground.) "The main technique of analysis under California law is to consider the nature both of the offense and of the offender. [Citation.] The nature of the offense is viewed both in the abstract and in the

33

totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

The California Supreme Court has "distilled three analytical techniques to aid [a court's] deferential review of excessiveness claims:  (1) an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society; (2) a comparison of the punishment with the punishment California imposes for more serious offenses; and (3) a comparison of the punishment with that prescribed in other jurisdictions for the same offense." (*In re Palmer* (2021) 10 Cal.5th 959, 973.) "Disproportionality need not be established in all three areas." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.)

Whether a sentence constitutes cruel and unusual punishment is a question of law. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1474.)  A reviewing court therefore applies the de novo standard of review when determining whether a defendant's sentence is cruel and unusual.  (*Ibid*.)

Here, we determine that defendant's sentence does not constitute cruel and unusual punishment under the federal or state Constitution.

Although the sentence is much longer than defendant's life expectancy, we do not find it to be "grossly disproportionate" to the severity of his crimes and number of convictions.  (*Ewing*, *supra*, 538 U.S. at pp. 20-21.)  A de facto life without parole sentence imposed on an adult for the prolonged sexual abuse and rape of a child is not cruel and unusual under existing standards. (*People v. Wallace* (1993) 14 Cal.App.4th 651, 666 [283 year sentence for multiple rape and other sexual offenses not cruel and unusual]; *People v. Huber* (1986) 181 Cal.App.3d 601, 633-635 [106 year sentence for multiple violent sex offenses not constitute cruel or unusual punishment].)

Defendant claims there is a "wide disparity" between his offenses and others that involve "far more significant injury, or threat of injury." He compares his offenses to what he characterizes as far "more serious offense[s]" like murder, manslaughter, torture or arson, and claims his sentence is what one "would expect for a mass murderer or someone who inflicted substantial disfigurement, or physical pain and suffering, on his victims . . . ." But defendant has cited no authority in support of his argument and, in any event, we find it unavailing. Defendant was convicted of 16 distinct charges and many of the sentences were doubled due to his criminal history under the three strikes rule. Applying the standards and authority set forth above, we find the sentence was not cruel and unusual under either the federal or state Constitutions.

## I.   Senate Bill 567 and imposition of upper terms of sentence

Defendant argues that recent amendments to section 1170, subdivision (b), enacted after his sentence was imposed, apply retroactively pursuant to *In re Estrada* (1965) 63 Cal.2d 740, and necessitate a remand for resentencing on the offenses for which upper term sentences were imposed. The People agree that current section 1170, subdivision (b) applies to this case. Nevertheless, they argue remand is unnecessary because any error was harmless.

As we explain below, we agree with the People that any error was harmless because we conclude beyond a reasonable doubt that all the aggravating factors relied on by the trial court would have been found true beyond a reasonable doubt by the jury.

### 1.   Procedural background

At the time defendant was sentenced, the trial court had broad discretion to determine whether imposition of the lower, middle, or upper term for counts 15 and 16 " 'best serve[d] the interests of justice.' " (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464 (*Lopez*), quoting former § 1170, subd. (b).) In accordance with that, the court imposed the upper term sentence for count 15—oral copulation by force, violence, duress, menace, or fear on a minor victim 14 years of age or older (former § 288a,

35

subd. (c)(2)(C))—and count 16—sexual penetration by force, violence, duress, menace, or fear of bodily injury on a victim 14 years of age or older (§ 289, subd. (a)(1)(C)).

The trial court identified the following aggravating factors from rule 4.421 of the California Rules of Court, on which it based the upper-term sentences: "The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree or cruelty, viciousness, or callousness [and] defendant continually used force to assault the victim [and] when he raped her after she had begun menstruating, the possibility of impregnating the victim increased substantially[;] [¶] . . . [¶] The victim was particularly vulnerable [because] her physical [stature] allowed the defendant to overpower her into submission to allow him to assault her [and] [he] assaulted her in her home or his where she believed she was in a safe environment[;] [¶] . . . [¶] The manner in which the crime was carried out indicates planning, sophistication, or professionalism [because] the defendant planned his assaults for times when he would not be interrupted by other family members and was able to assault her over the course of several years, avoiding detection[;] [¶] . . . [¶] The defendant took advantage of a position of trust or confidence to commit the offense [because he] was the victim's brother-in-law, which allow[ed] him access continuously to the victim at both the victim's home and at his home when the victim slept over[;] [¶] . . . [¶] The defendant . . . engaged in violent conduct, which indicates a serious danger to society[;] [¶] The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness[; and,] defendant has served a prior prison term." The trial court identified just one mitigating factor— defendant's apparently satisfactory performance on parole from 1995 to 1998.

### 2. *Senate Bill 567, retroactivity and harmless error standard*

During the pendency of this appeal, the Governor signed Senate Bill 567, which amended section 1170 and became effective on January 1, 2022. "Pursuant to Senate Bill No. 567, section 1170, subdivision (b) has been amended to make the middle term the

presumptive sentence for a term of imprisonment; a court now must impose the middle term for any offense that provides for a sentencing triad unless 'there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.' " (*Lopez*, *supra*, 78 Cal.App.5th at p. 464, quoting § 1170, subd. (b)(1) & (2).)

We agree with the parties that Senate Bill 567 is ameliorative in nature and applies "retroactively to all cases not yet final as of January 1, 2022." (*Lopez*, *supra*, 78 Cal.App.5th at p. 465; *People v. Garcia* (2022) 76 Cal.App.5th 887, 902.)

The Courts of Appeal are currently split regarding the applicable standard for determining whether there is harmless error when a defendant was sentenced under the former version of section 1170 and the amended version applies retroactively. (See, e.g., *People v. Flores* (2022) 75 Cal.App.5th 495, 500-501 [reviewing court must find beyond a reasonable doubt that jury would have found beyond a reasonable doubt at least one aggravating circumstance true]; *Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11 [harmless error if "reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied"]; *People v. Wandrey* (2022) 80 Cal.App.5th 962, 982, review granted Sept. 28, 2022, S275942 [reviewing court "must ask both whether we can be certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court *and* whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term"]; *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1112 [reviewing court must first determine beyond a reasonable doubt that "jury would have found true at least one of the aggravating circumstances that the trial court relied on," and then whether, if the trial court relied on

other aggravating circumstances, "it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error"].)

### 3. *Analysis*

We need not decide which standard applies here because we conclude beyond a reasonable doubt that all the aggravating factors relied on by the trial court for counts 15 and 16 would have been found true beyond a reasonable doubt by the jury; accordingly, under any of the standards set forth above, the error was harmless.

The evidence in the record supports and establishes the aggravating factors that the trial court relied on to impose the upper-term sentence: great violence; bodily harm; a high degree of cruelty; viciousness and callousness; the victim's vulnerability; the planning and sophistication of the offenses; defendant's abuse of a position of trust and confidence; the serious danger he poses to society; and his prior convictions and prison term.

The jury heard Jane Doe's testimony about defendant's prolonged sexual abuse from age six to age 15 or 16, including forced oral copulation, digital penetration of her vagina and anus, and forcefully inserting his penis into her vagina. The jury also heard testimony about how defendant took advantage of a position of trust to commit these offenses, as he was a family member and authority figure and Jane Doe's mother relied on him to take care of Jane Doe. Jane Doe and others testified at length to the trauma and anxiety the offenses caused, and how defendant used threats to prevent Jane Doe from telling anyone, thereby enabling further abuse. And the parties stipulated to defendant's prior convictions for robbery and false imprisonment.

On this record, it is beyond a reasonable doubt that all the aggravating factors would have been found true beyond a reasonable doubt by the jury; accordingly, under

any prejudice standard the trial court's failure to apply amended section 1170, subdivision (b) was harmless.[11]

### III. DISPOSITION

We affirm the judgment.

---

[11] The trial court also based its imposition of the upper term sentence in part on defendant's prior convictions and the increasing seriousness of his offenses. Section 1170, subdivision (b)(3) provides that a trial court can consider a defendant's prior convictions when making its sentencing decision based on a certified record of conviction without submitting the prior conviction to the jury. (§ 1170, subd. (b)(3).)

_____
Wilson, J.

WE CONCUR:


_____
Bamattre-Manoukian,  Acting P.J.



_____
Danner, J.



People v. Johnsen
H048634